Rives, J.
These cases present for consideration, in two aspects, the constitutionality of the act of Assembly, passed 18th February, 1867, extending the limits of the city of Richmond. In the first, the plaintiffs in error, as resi *606 dents, voters, tax-payers and property-holders in the county of Henrico, and creditors of the same, complain that this act violates their constitutional rights in these several capacities hy the withdrawal of population and the resources of taxation from the county, the disturbance of their rights of representation, the augmentation of their county levies, and the diminution of county receipts. In the second, the plaintiffs in error are within the annexed territory, and as such object to the competency of the Assembly, by this act, to disturb their electoral privileges and relations, and to subject them to the increased burthens of the city government.
It is agreed by the counsel here, that the effect of this act is to annex to the city about fifteen hundred acres of territory that had been already laid off, built up and densely populated as suburbs of the city, and to take within these new limits a population of about fourteen thousand. The new boundary also cuts off from the city and adds to the county about one acre. There was no vote taken at any time in these separate communities upon the question of annexation; so that, from all that appears in this case, it may be assumed as done in invitos. These, therefore, are the principal and material results of this act of Assembly, and the facts of this case.
The act, the constitutionality of which is questioned in these cases, was passed February 13, 1867, and is entitled “ an act to extend and define the boundaries of the city of Richmond.” Sess. Acts 1866-7, p. 635. The first and second sections prescribe the new boundaries of the city, as extended, without any mention of the parts of Henrico thereby annexed to the city, or of the small part exscinded from the city and added to the county. For such facts, as already stated, we have the authority only of the agreed statement of the counsel here. The third section exempts the inhabitants of the annexed territory for the period of *607 five years from liability for tbe anterior city debt, or its interest; the fourth appropriates the taxes of such inhabtants, for three years, to the improvement, protection and police of their district; t\\Q fifth empowers the sheriff and other collectors of the county of .Henrico to collect public dues or officers’ fees unpaid at the commencement of the act; the sixth provides for the collection by the authorities of Henrico county, within the annexed territory, of the county levy for the year 1867, and exempts the persons and property therein from city taxes for that year; the seventh directs the City Council to provide for the representation in that body of the inhabitants thus added to the city; finally, the eighth section, which is the commencing clause of the act, gives it effect from the 1st July, Í867. This is literally the whole of the act.
The questions growing out of it, now presented for our consideration, may be resolved into three classes: first, those affecting the political state of the inhabitants of the county transferred to the city; secondly, the allegations of permanency and unchangeableness of the counties and cities named in the constitution; and thirdly, those relating to the power of the Assembly, by any process of annexation, to render the citizen liable to other and greater taxes than those incident to the local administration under which, it is assumed, he was permanently placed by the constitution. Great latitude has been allowed to the discussion of these questions ; the counsel for the plaintiff in error has been twice heard at great length; and his views pressed with an earnestness that attested the strength of his convictions. We are also told that the same arguments were addressed to both branches of the General Assembly; so that this act was not passed without controversy, nor without the fullest consideration of its merits. The magnitude of the interests involved, the nature of the rights affected, and the natural excitement *608 interested speculations on the subject, have imposed Up0n us the duties of careful deliberation and patient investigation. If we do not experience the difficulties and doubts that have been expressed upon this subject, it does not arise from inattention to the arguments, adduced, or the authorities cited. We have given to these full consideration. We do not propose to review them at length, or in- detail; but a concise statement of the results at which we have arrived, and our reasons therefor, will suffice to show that they have not been pretermitted in our examination of these cases.
1. Our first enquiry is into the effect of this act upon the right of voting and of representation pertaining under the constitution to the inhabitants of the annexed territory. It has been seen that the act is wholly silent upon this subject. If, therefore, their rights and duties in this respect are at all disturbed, it is due to this silence, and not to any enactment of the law. But can such an effect legitimately ensue from such a cause? We find opposed to it, the practice of the General Assembly—see note to Code of 1860, p. 89, where instances are given, in the formation of new counties under the constitution of 1851, of acts failing to prescribe how the people should vote; and where, as a consequence thereof, they were left to vote with the counties from which they were taken. If it be conceded, as perhaps it ought to be, that voting and representation are rights territorially ordained and adjusted by the constitution, and as such, cannot be altered by the Assembly, it would be a violent presumption to infer from the silence of the act, that it designed to interfere with these rights. The reasonable inference is directly contrary. They were left where the constitution placed them; there was no necessity to indicate by law, upon such an event, where the people were to vote, or how they were to be represented. The constitution was the only *609 rule upon that head; and however or wherever the boundaries of the city might be extended, the citizens of Henrico on the one hand, and of Richmond on the other, were to vote and to be represented as the constitution appointed. Instead of making, as we are plainly required to do, all reasonable presumptions and fair inferences to sustain the constitutionality of a law, we should disregard the obvious import of the act, and the respect we owe a co-ordinate branch of the government, by attributing to this silence an implied direction, in derogation of the constitution, to vote and be represented along with the new communities thus created. A decent respect for the Assembly, that passed this act upon full advisement, forbids us to suppose that they thereby intended to incorporate with the city and county respectively the added inhabitants, for the purposes of voting and representation, as well as municipal government. The latter was the object of the law; the former, apart from it and beyond it. What reason can be given that the political status of these citizens should not remain the same after as before the act? True, their municipal government was changed; citizens of Henrico ceased to be such, and became citizens of Richmond to that end alone, and vice versa; but constitutional limits still remained for the exercise of constitutional rights, and the enjoyment of constitutional privileges. If it could be said that this act did anything to obstruct these rights, or in any way render them impracticable, the case would he different; but inasmuch as these people can, without difficulty or uncertainty, vote and be represented as the constitution ordains, it is fair to say that their rights in this respect are not disturbed by this act, hut, as in other cases, remain the same. I cannot believe that this act would have been assailed in this particular, if it were not for the authority of adjudged cases in Massachusetts and New York, that are earnestly claimed to be decisive upon *610 Ais point. Accustomed, as we are, to pay great respect to the decisions of courts of sister States, we of course incur the obligation of making proper discriminations, and avoiding the too common danger of a wrong application of the rulings. Keeping in view this obvious duty, let us first examine the case of Warren and others v. The Mayor and Aldermen of Charlestown, 2 Gray’s R. 84. In this case, the act for the annexation of Charlestown to Boston was held to be unconstitutional, because it undertook to erect the territory of Charlestown until the next decennial census, into a representative district, which is neither a town nor a city, and contains no adequate provisions to secure to the inhabitants' of Charlestown their rights to elect representatives and senators in the general court and representatives in Congress. This act, while it merged the city of Charlestown into the city of Boston, purported to reserve the electoral rights- of the former, as if the law had not been passed ; but this reservation was alleged to be futile, because no provision was or could be made under the constitution to give it validity. Chief Justice Shaw, in his opinion, p. 99, stated the principal ground on which the constitutionality of the act was assailed, to be “ that the main scope and object of the act is to annex the city of Charlestown, with its territory, property and inhabitants, to the city of Boston; and to annul the charter of the city of Charlestown; whereas Boston and Charlestown are now separate municipal corporations, constitute several representative districts for the election of separate representatives to the general court, belong to distinct counties, constitute parts of distinct representative districts for the choice of representatives in the Congress of the United States, and yet no adequate provision is made, in the act in question, for the exercise and security of the political and constitutional rights of the citizens of Charlestown, after the merger, which, by *611 the act, is to take effect immediately on the issue and pub■lication of the certificate of the Secretary of the Commonwealth that the act has been accepted.” This objection was sustained, and for reasons peculiar to Massachusetts, and inapplicable to us. They were predicated of the peculiar provisions of "the Massachusetts constitution upon the subject of representation. Representation was declared to be a corporate right attached to the town as a corporation, and not to any inhabitants or territory, and can only be exercised in a corporate capacity. 7 Mass. R. 526; 15 Mass. R. 537; and 3 Pick. R. 519. To this corporate right of representation was annexed the corporate privilege of determining whether the town will send any, and how many representatives. Under the constitution, the representative must be an inhabitant of the town for which he is chosen; the voter must vote in the town within which he resides; the town may be fined for neglect to send representatives, &c., &c. All these requirements of the constitution, it will be seen, were distinctly contravened by the annihilation of the city of Charlestown, and its merger in the city of Boston. The inhabitants of the city of Boston could not decide for the extinct city of Charlestown, how many representatives the latter should send to the general court; nor be fined for neglect of the .latter to send any ; nor'could it„be held that a resident of Boston was a voter in Charlestown, or eligible as a representative therefor. It seems to me, therefore, to have been properly ruled in this case, that while the rights of voting and representation were nominally reserved as they formerly stood, they were in truth abrogated, or, at least, incapable of being enforced according to the constitution. The opinion of the Judges, 6 Cush. R. 578, was distinctly approved, whereby it was declared competent by the Legislature to change the boundaries of towns for general muni *612 cipal purposes, provided the territory thus set off from one town to another, or the different portions of territory of which any new town was composed, should, by proper provisions in the act, until the next decennial census and apportionment of representatives, be and remain a part of the town from which they were respectively taken, for the purpose of electing representatives.
A further objection to the constitutionality of the act arose from its failure to provide any means by which the inhabitants of Charlestown, after the annexation, could participate at all in the election of representatives to Congress. Charlestown was in District No. 7, and the city of Boston divided, with six wards in one district, and six in another. The difficulty attributable to this failure or silence of the law is thus stated by Chief Justice Shaw, p. 105 : “ After the annexation,- the inhabitants of the territory, now Charlestown, although it might still be considered as part of District No. 7, would have no right and no power to vote in that district, because the town of Charlestown, as an organized body, with its officers, would no longer exist to call meetings and receive and certify votes ; and no authority is conferred on the mayor and aider-men of Boston, or any other officer, to perform these duties. They could not vote with Boston, because Boston, as a municipal corporation, does not form a representative district, and its twelve wards are distributed and appropriated in other districts. No provision is made for the uniting of the two Charlestown wards with any corporation or organized body for electing members of Congress; the inhabitants, therefore, for the time being, and for an indefinite term of time, would in this respect be wholly disfranchised. It is no answer to say, that this is a defect which may be amended by the Legislature; it would depend wholly on the will of a future Legislature whether to *613 amend it or not, whereas the act within itself should make provisions for all the changes which it effects in the rights and condition of the inhabitants.”
The case of Kinney v. City of Syracuse, 30 Barb. R. 349, is, in like manner, founded on a special provision of the constitution of New York, declaring that the Assembly districts, when once fixed and determined by the Board of Supervisors, shall remain unaltered until the next decennial enumeration. In consequence thereof, it was held, that the annexation of a part of the city of Syracuse to the adjoining town of Dewitt, whereby two Assembly districts were altered without any provision being made in respect to the political status of the inhabitants of the exscinded and annexed territory, or defining their rights in reference to the Assembly districts, or the manner in which they should participate in the election of representatives from the several districts, was unconstitutional and void. Judge Bacon, in delivering the opinion of the court, admitted that the power to create towns or to change their boundaries is legislative in its character, and, irrespective of any provision which would control or circumscribe it, must rest in the discretion of the Legislature as to the time and manner of its exercise; but held that this power was, in this instance, restricted by the precise constitutional provision already quoted.
I have thus stated at some length the grounds and principles of these decisions, that it might be apparent how inapplicable they are to the case at bar. The cases are wholly dissimilar. The Massachusetts case, which was the leading one, rests on the practical inadequacy of the provisions made by the law for the fulfilment of the constitutional rights nominally saved by it, and its total failure to secure the means or appoint the mode of electing representatives to Congress in the districts thus confounded; and the New York case on an express prohibition of the *614 constitution. But no such difficulties, obstructions or prohibitions exist here. It cannot be said, that the voters' of Henrico are prevented by this act of annexation from participating in the same elections, and having the same rights of representation as appertained to them before. The silence of the act is as potential to leave them in possession of these rights as a special and express enactment that it was not thereby designed to change the constitutional arrangements for voting, representation and courts. Had such an express enactment been made in this statute, no exception, I presume, would have been made to its constitutionality on this score; but, I confidently submit, its silence is of equivalent import and force, because the inference is irresistible, that these rights, not being amenable to legislation, were left to exist under the constitution as they did, more especially as under our polity no new provisions of law were required to meet and adjust these changes of boundaries and municipalities. But does not the history of the times furnish an explanation and excuse for the silence of the act in this respect ? The State had not as yet been recognized by the authorities of the United States since the overthrow of the Confederacy, to which it had attached itself. A general expectation existed of the necessity of a speedy change of its constitution; and before the passage of this act, the agitation commenced in Congress, which resulted in the passage of the act of Congress of March 2, 1867, “to provide for the more efficient government of the rebel States.” This act proceeded'upon the recital that “no legal governments ” existed in these States, Virginia included, and as a means of “preserving peace and good order in said States until loyal and republican State governments can be legally established,” erected them into military districts, and subordinated the existing governments to military authority. The fifth section of this act *615 contemplated the formation of new constitutions for these States, and ordained the mode and conditions of framing and ratifying them. The Governor of this State imme- . ,,. , » n ,, diately communicated this act to the Assembly, which, after the expiration of its constitutional term, had just been recalled, and urged them to provide for the call of a convention in conformity therewith. A bill to this end passed the Senate, but its further progress was arrested by the act of Congress of the 23d March, 1867, which, by establishing all the agencies necessary to the call of this convention under the superintendence and management of the military commanders, wholly superseded the functions of such a bill. From this contemporaneous history, it is reasonable to infer that the General Assembly then regarded the existing government of the State as provisional and temporary, and did not recognize (as it otherwise might have done under a greater prospect of permanency) the necessity or propriety of making express provision for the short period preceding a new organization of the State. The absence, therefore, of these provisions is sufficiently accounted for by the remarkable circumstances under which the Assembly was legislating; and it seems to me to militate against the deference we are accustomed to pay to our law-makers, to construe such an omission, under such circumstances, into a violation of their constitutional obligations. I conclude, therefore, that this first and most serious constitutional objection is not tenable.
II. We are next to consider, whether the counties and eities of the Commonwealth, as is strenuously contended, are such component and structural parts of the body politic as to be incapable of alteration for municipal purposes by the General Assembly ? This remarkable attribute of permanency is predicated chiefly, if not solely, of the fact that they are named in the constitution, and thereby so *616 incorporated, as it is urged, in its fabric as to be incapajqe q£ legislative change in name or boundaries. The statement of this pretension 'would seem to be sufficient . . . ^ .... to mark its extravagance, ir not to carry with it its own ® J refutation. The counsel who advanced it was confronted ^ his own authorities (cited, however, for a different purpose,) from 6 Cush. 575, 578; 2 Gray 84, and 30 Barb. 349. These cases conceded an inherent legislative power to change, for municipal purposes, the boundaries of towns, either by the erection of new ones out of parts of others, or by setting off to one portions of another; but the main point of them consisted in this, namely, that such changes could not be made so as to affect the constitutional rights of suffrage and representation by rendering tbeir observance or enforcement impracticable. The principle is freely admitted by counsel for the appellants, that the plenary grant of legislative power embraces this control over the division and limits of counties, unless, indeed, the mention of them in the constitution so made them parts thereof as to make their continued and unchangeable existence vitally necessary to its integrity. Let us, therefore, examine the constitution to see how and for what purpose the counties and cities are named therein, and what foundation exists for the proposition that they are integral parts of the governmental fabric, and therefore as permanent and unchangeable as the constitution itself. In the fourth article, the legislative power of the Commonwealth is vested in a General Assembly, consisting of a Senate and House of Delegates. There is no limitation upon this grant; and it will be important to another part of our inquiry to remember that it is ample enough to carry with it such legislative control over persons and property, for the purposes of general and local government, as is asserted and exercised by the sovereignty of a State. The third section of this article simply declares, that the *617 “ House of Delegates shall be elected biennially by the voters of the cities of Norfolk and Richmond, and the several counties on the fourth Thursday in May.” The phrase, “distributed and, apportioned,” employed in the correlative passage of the constitution of 1851 is omitted here; but I presume there is no significance in this, for the representatives are not the less clearly “ distributed and apportioned” thereby among the said cities and counties. The fourth section arranges the counties and cities into classes : first, those to elect three delegates; secondly, those to elect two delegates; thirdly, those to elect one delegate; and fourthly, those to compose election districts, and as such to elect one delegate. Again, these counties and cities appear in the fifth section as arranged in thirty-four districts for the election of senators, wherein the county of Henrico, with Louisa and Hanover, forms the sixth district, and the city of Richmond the tenth. The sixth section directs in the year 1870, and in every tenth year thereafter, a re-apportionment of representation among the cities and counties, from “are enumeration of the inhabitants of the State.” In article six, respecting the judiciary department, the cities and counties are again enumerated and arranged into judicial circuits and districts.
These are the only instances in which the counties and cities are enumerated in the constitution; and the enquiry recurs, whether this enumeration can have the magical effect of exempting them from all legislative change. To determine this, we must settle in our minds the purpose for which these existing territorial divisions were referred to, and the sense in which they were employed by the constitution. Unlike the towns of Massachusetts, our counties possess no corporate right of representation; their well known bounds and population afforded to the framers of the constitution the readiest, if not the only, mode of *618 designating the apportionment of representation in the two Houses of Assembly, and appointing the jurisdiction of circuit and district courts. Nor was it a representation of territory ; but rather of the persons and property comprised in these local departments. If this were not manifest from the republican theory of representation, it would be inferable from requiring future apportionments to proceed from “ an enumeration of the inhabitants.” It is presumed that the framers of the constitution, having before them the census returns of the various counties and cities, could not, without the greatest inconvenience and a resort to a future cumbrous machinery, ignore these divisions, and fail to adopt them as the basis for the construction of the legislative and judicial departments. That they did so, resulted, in my view, from convenience and the fitness of things, rather than from the imputed design to fix these divisions unalterably in the framework of the government. While representatives were nominally appointed for these counties and cities, it was merely meant thereby to indicate that the people residing within these defined boundaries should severally choose such representatives ; and their rights in this respect would be as certain and as defined, no matter what changes might be made by law in their names, shapes or boundaries. It is the city of Richmond and the county of Henrico, as they existed at the formation of the constitution, that must be looked to in the ascertainment of these electoral rights; and no matter how their names or limits may be altered, such changes cannot be allowed to interfere with constitutional rights which are fixed by and referred to these divisions as they were designated in the constitution, and just as easily and conveniently settled as if no such changes had occurred in their names or limits.
It is conceded by the ingenious counsel who has pressed apon us these subtle refinements upon the letter of the *619 constitution, that towns might he erected within the existing boundaries of counties, because such boundaries would not thereby be altered or affected; and as a consequence thereof, I presume he would not question the competency of the Assembly to create, out of the population and territory of Henrico, wherever it thought proper, a new town, and provide for it a municipal government. Hence, if these suburbs, so far as they were included within the county of Henrico, had been incorporated as an independent municipality, these constitutional cavils would not apply; nevertheless, the same public evils, the same social mischiefs, the same individual grievances, would ensue. But now that the Assembly has concluded, and as it seems to me with great good judgment, that by extending over these settlements the corporate authority of the city of Richmond, the needed organization of these suburban communities might be had at less cost and inconvenience, and more conformably to the obvious proprieties of the situation, it would not comport, in my view, with that broad and liberal spirit of enquiry which should control judicial interpretations of the constitution, to decry the latter measure as unconstitutional, and sustain the former as constitutional. It would be, in my opinion, to attribute to county lines and divisions a constitutional fixity, which, however ingeniously advocated, they do not in fact possess by prescription, reason, authority or precedent.
The practice of the Assembly, under the constitution of 1851, in the change of county lines and the formation of new counties, (to numerous instances of which we have been referred in the argument,) taken in connection with the constitutional restriction upon the formation of new counties, strikingly corroborates the views I have presented against this broad and novel challenge of the legislative power, under the constitution, to change, in any *620 particular, even in name, what the counsel is pleased to term constitutional counties and cities, because of their names appearing in that instrument.
As to county districts or citv wards, and the elecJ tion of local officers therein, the former are subject to changes by the General Assembly, under the 26th clause of the 4th article, under the head of “ County Courts ; ” so that there is no difficulty nor inconvenience in the re-adjustment or transfer of them, and in the matter of new regulations for municipal government, and local elections in pursuance of law.
III. The third and last enquiry is into the alleged grievances of the plaintiffs in error, resulting from the withdrawal of population, territory and taxable wealth from the county of Henrico, and the subjection of the annexed inhabitants to liabilities for the city debt and the city taxes, which they would have escaped without this act of annexation. The resources of the county are greatly depleted by this measure, so that its remaining citizens and creditors may well object to the loss of the accustomed contributions; and the abstracted citizens may revolt at the prospect of city burthens. But provided the General Assembly has the right thus to change and shift these municipalities, as I have endeavored to show, these consequences, however grievous, are addressed to the legislative will and discretion, and cannot legitimately undergo judicial supervision, or challenge judicial redress. Some violation of the constitution, State or Federal,.must lurk in these results, in order to place the measure without the category of those that may be characterized as the abuse rather than the transgression of power. Accordingly, it is urged that this measure is violative of the obligation of contracts, and, in the form of public contributions, takes, without consent, private property for public purposes, with *621 out just compensation. It is also contended that it is by means of a voluntary removal only, as contra-distinguished. from a legislative act, that a citizen previously without the city, can be brought within its authority and subjected to its charges. But it should be remembered that the expediency, if not the necessity, of this incorporation has grown out of the voluntary acts of this suburban tion in making these thick settlements, and projecting them upon the prolongation of the streets, so as to make them conform to the plan of the city. It is not doubted, however, that these exterior settlements were, in no small measure, dictated by the expectation of escaping city taxes, at the same time that the facilities of doing business, the chances of lucrative employment, and other advantages in the city, were secured to the inhabitants by their position on its outskirts. Yet, they must be presumed to know, that their establishment of an actual town might eventually expose them to the liability of being put under a municipal charter, at the pleasure of the General Assembly. No one has ever yet doubted the supreme authority of that body to grant charters to towns. It is an attribute of that sovereignty which, in its unrestricted functions of taxation and legislation, regulates the affairs of the people, and carries on their government, local and general, under the constitution; and whatever irregularities may arise from the grant of such charters, they are to be taken as the incidents of this governmental will, and rest in the discretion of the Assembly, without appeal to the courts or other arbiter. The necessity or propriety of granting such charters implies the power to defray local expenditures out of local contributions to be levied by the corporation, although such local impositions are in addition to the State taxes. It would not do to throw the local charges of such incorporated communities upon the gen *622 era^ treasury of the whole people; therefore, the provision t]lat tke taxation of the State shall be “ equal and uniform throughout the Commonwealth,” absolutely requires that these local charges should fall exclusively upon the local 6 . . ... . communities; and the compensation and justification for it must be sought in the chartered privileges, and the uncontrollable discretion of the Assembly. Had it pleased the Assembly to grant an independent charter to this exterior town, it is admitted by the appellants’ counsel that no constitutional exceptions could have been taken to the measure, although the grievances now complained of would doubtless have been aggravated by such a separate corporate existence. How, then, shall the extension of the charter of the interior town over the exterior one, which, in the progress of time and the pursuit of private interests, had grown up on its borders, be deemed unconstitutional, while all the city privileges of police, gas, water, &c., were obtainable at far less cost and inconvenience ? It seems to me, therefore, that if any wrong has been done to the appellants by this extension of the city limits, it has not been owing to any violation of the constitution, but to the lack of discretion and precaution on the part, of the Assembly, upon which we have neither the right nor the disposition to sit in judgment, nor the materials, in this case, to form or express an opinion.
I am indebted to the remarkable familiarity of my brother Joynes with adjudged cases in this country, as well as abroad, for a reference to a most apposite case, before the Court of Appeals of Kentucky. It is the case of Cheaney v. Hooser, 9 B. Monr. R. 330, which brought up for consideration all these and other constitutional exceptions to the extension of the limits of the town of Hopkinsville. The opinion of the court was delivered by Chief Justice Marshall, of that State, and is so elaborate, *623 exhaustive and conclusive, that I may be well permitted to close my investigations by a reference to that authority, and the luminous reasoning of the court.
The decrees of the court below are, therefore, affirmed.
The other judges, concurred in the opinion of Rives, J.
Decrees aeeirmed.