STATE OF MINNESOTA *ex rel.* Minnesota Railway Construction, Company *vs.* CITY OF LAKE CITY and TOWN OF LAKE.

## January 13, 1879.

**Use of "Village" for "Town" in a Law.**—On March 6, 1868, an act was-passed, entitled "An act to authorize the Village of Lake City to aid in the construction of the St. Paul & Chicago railway." Upon the facts-stated in the opinion, *held,* that the word "village" was inadvertently used in the title, as well as in the body of the act, for the word "town," and that the statute was not thereby rendered inoperative and void.

**Municipal Bonds for Railway—Time for Issuing.**—A statute which authorizes a town, at any time prior to a day therein specified, to create and issue its bonds in aid of a public enterprise, by a vote of its supervisors, to be ratified at an election authorized to be held at any time prior to said day, and which also expressly provides that no bonds shall be issued till after such ratification, and that they shall then be issued and disposed of in such way as the parties may thereafter agree upon, does not require the formal execution and delivery of such bonds prior to the day limited for said ratification. *Warsop* v. *City of Hastings*, 22 Minn. 437, followed on this point.

**Same—Performance of Conditions by Company.**—Where, pursuant to an express legislative authority, a municipality adopts an ordinance obligating it to issue its bonds in a definite amount, in aid of the construction of a certain line of railroad, as a bonus to the company owning the same · and then engaged in its construction, upon compliance with certain conditions named in the ordinance, the performance of such conditions by the company creates a valid and binding obligation against such municipality to issue its bonds in accordance with such ordinance. *State-* v. *Town of Lime*, 23 Minn. 521, followed and approved on this point.

**Division of Town—Liability for Old Debts.**—It is constitutionally competent for the legislature to erect, out of a portion of the territory of an existing town, a new municipal corporation, without making any provision for the debts and liabilities of such town previously incurred. In such case, the old town remains solely responsible for such debts and liabilities, and no claim can be enforced against the new corporation in respect thereto, either in favor of the town or its creditors. Such legislation impairs no contract rights or obligations, though the taxable resources of the town may be thereby largely diminished, and though such debts may have been incurred upon the faith of a statutory pledge that the town would provide a sufficient sinking-fund, by taxation, to pay the same at maturity, it not appearing that its power so to do has been rendered ineffectual for that purpose.

**Municipal Bonds for Railway—Averment that Voters were influenced by False Promises.**—The writ recites that the ordinance whose provisions are sought to be enforced against the town was duly passed by a vote of a majority of the supervisors of said town, and ratified by the legal voters thereof, at an election held for that purpose, pursuant to the statute authorizing it. In answer thereto, the respondent alleges, "that the St. Paul & Chicago Railway Company, upon the passage of said ordinance, and as an additional and further inducement to pass the same, and also, to induce and influence the voters of said town to ratify said ordinance, falsely and fraudulently represented that said company would build its engine-houses, car and machine-shops in said town of Lake City, thereby increase the property of said town liable to taxation, and increase the population of said town to a great extent, which representations and promises were false and untrue, and only made for the purpose aforesaid." *Held*, that this portion of the answer or return is irrelevant and redundant, and should be stricken out.

**Same—Corruption of Board of Town Supervisors by Company.**—It is also alleged in said answer or return, as follows: "That before said ordinance was so passed by said supervisors as aforesaid, the said St. Paul & Chicago Railway Company fraudulently and corruptly, and for the purpose of inducing the then supervisors of said town to pass the same, promised and agreed to and with the said supervisors, that if they would pass the said ordinance as aforesaid, the St. Paul & Chicago Railway Company would locate the depot of said company in said town of Lake City, on the private property of said supervisors, and represented to said supervisors that by reason of such location, the said property of said supervisors would be greatly enhanced in value; that said supervisors, induced and influenced by said fraudulent and corrupt promise and agreement, and by other and further fraudulent and corrupt considerations then paid and promised to said supervisors by said company, passed the said ordinance; and said respondent, on its information and belief, alleges that the said supervisors would not have passed the same,

but for the said fraudulent and corrupt promises and payments afore-said." *Held*, that the matter contained in this portion of the answer or return is not irrelevant, and ought not to be stricken out as such.

**Assignee of Chose in Action.**—The assignee of a chose in action takes it subject to all defences, legal or equitable, existing against it in the hands of the assignor, at the time of the assignment.

**Mandamus—Trial by Jury.**—The right to a jury trial in respect to issues of fact in a proceeding by mandamus, instituted in this court, is not secured nor allowed to either party under the constitution of the state.

Alternative writ of mandamus to compel the issuance of bonds voted in aid of the St. Paul & Chicago railway. The case made by the relator in the information and the alternative writ, is in substance as follows:

Long before March, 1868, the St. Paul & Chicago Railway Co. was and still is a corporation authorized to construct and operate a railway from St. Paul, by way of Hastings, Red Wing, Lake City, etc., to Winona, in this state, and the relator was and is a corporation authorized to construct, equip, own and operate railways in any part of the state, and to enter into all contracts connected with the exercise of such powers. In March, 1868, and long prior thereto, and thereafter until February 26, 1872, the town of Lake City was a municipal corporation, with all the rights and powers belonging to towns in this state, and was composed of and embraced within its territorial limits the congressional township No. 111 north, of range 12 west, in Wabasha county, according to the United States survey. On March 6, 1868, while the railway company was engaged in constructing its railway, the legislature passed an act, entitled "An act to authorize the village of Lake City to aid in the construction of the St. Paul & Chicago railway," (Sp. Laws. 1868, c 15,) which will be found in the margin.*

*Section 1. The town of Lake City may, at any time prior to August 1, 1870, by a vote of a majority of its supervisors, or their successors in official trust, subject to the approval and ratification of the legal voters of said village (*town*) as hereinafter provided, create and issue its bonds, with interest coupons attached thereunto, to an amount not exceeding in the aggregate the sum of seventy-five thousand dollars, bearing interest at a rate not to exceed eight per cent. per annum, payable either annually or

On February 2, 1869, while the railway was still in course of construction, the legislature passed an act, (Sp. Laws 1869, *c.* 41,) entitled "an act to amend" the act of 1868, and providing that such act "be and the same is hereby amended as follows, to wit: The word 'town' shall be and is hereby substituted for and in the place of the word 'village,' wherever it occurs in said act; and the word 'thirty' likewise substituted for the word 'twenty,' preceding the word 'years,' in the first section of said act; and the word 'ten' likewise substituted for the word 'thirty' preceding the word 'days,' in the second section of said act." These amendments are inserted in parentheses in the act printed in the note.

Pursuant to the authority given by these acts, and while the railway was still in course of construction, the town of Lake City by its board of supervisors duly convened on February 6, 1869, adopted an ordinance, which after referring to the acts of 1868 and 1869 as the authority for its passage, proceeds as follows:

"We, the supervisors of the town of Lake City, do ordain that,

semi-annually, which bonds shall be payable at such place and at such time or times as shall be therein named, not exceeding twenty (*thirty*) years, and to pledge the faith of said village, (*town,*) or the municipal corporation which may succeed it, for the payment of the principal and interest of said bonds. The bonds hereby authorized, or the proceeds thereof, shall be used in the construction of the St. Paul & Chicago railway.

Sec. 2. Before said bonds are issued, the question of issuing them shall be submitted to the legal voters of said village (*town*) at any general or special election, thirty (*ten*) days' notice to be given previous to said election, by publication in some newspaper published in said county of Wabasha, and the said supervisors, or their successors in official trust, are hereby authorized to appoint and call a special election for such purpose, which shall be conducted in manner and form as elections are usually conducted in said village (*town.*) The voters at such election shall use ballots upon which shall be printed or written, or partly printed and partly written, the words "For Railway Bonds," or the words "Against Railway Bonds," as the voters shall choose. If a majority of the ballots so cast at such election shall have upon them the words "For Railway Bonds," then the said bonds shall be issued, and the said supervisors, or their successors in official trust, may make any and all such agreements as they may deem proper with said railway company, for or relating to

in order to aid the St. Paul & Chicago Railway Co. in the construction of their railway, there shall be donated and delivered to the said company $75,000 of the bonds of the town of Lake City, bearing interest at the rate of six per cent. per annum," etc., "the principal to mature thirty years after the date of such bonds; and for the payment of which a sinking-fund shall be provided, to commence within ten years from the date aforesaid, sufficient to discharge the same at maturity: and *provided*, that said bonds shall not be delivered until said railway shall be constructed and in full operation, with cars running thereon, from St. Paul to Winona: and *provided* said railway shall be so completed and in operation on or before April 1, 1872; and for the delivery of said bonds and the payment of the interest and principal thereof, the faith and credit of said town of Lake City are hereby pledged.

"And it is further ordained that the question of issuing said bonds as aforesaid shall be submitted to the legal voters of said town of Lake City, at a special election, which is hereby appointed and ordered to be held on February 23, 1869; that the disposal of the said bonds, or the proceeds thereof, in aid of said railway. But if a majority of said ballots shall have the words "Against Railway Bonds" upon them, then the said bonds shall not be issued: *provided*, that the question of the issuing of such bonds may again, at any time or times prior to August 1, 1870, in like manner be submitted to said legal voters, and with like effect.

Sec. 3. For the purpose of paying the principal and interest of said bonds, an annual tax shall be assessed and levied upon the taxable property of said village (*town*,) in amount sufficient to pay the interest on the bonds so issued; and when the principal, or any part of the principal, is about to become due, a sufficient amount to pay such principal; and the payment of principal and interest may be apportioned upon such years as the said supervisors may deem expedient; or they may annually levy upon such taxable property, and cause to be set apart as a sinking-fund, such sums as, with the accrued interest thereon, shall amount to an equal proportion of the whole amount of bonds issued, which shall be applied to the punctual payment of said bonds at maturity. Said taxes shall be levied and collected in the same manner as other taxes are levied and collected in said village (*town*,) or the municipal corporation which shall succeed it.

Sec. 4. This act shall take effect and be in force from and after its passage.

at least ten days' notice of said election be given, by publish-ing such notice at least once in each week for two successive weeks in the Lake City Leader, together with a copy of this ordinance."

After providing for the manner of conducting the election, and canvassing the returns, the ordinance concludes: "And if the majority of the ballots so cast at such election shall have upon them the words ' for railway bonds,' then the said bonds shall be issued and delivered, upon the terms and con-ditions above named, but not otherwise."

Publication was made and the election held and the votes canvassed as required by the ordinance, a large majority of votes being for the issue of the bonds.

Partly in consideration of the obligation of the town, thus contracted, to issue such bonds, the St. Paul & Chicago Rail-way Co., on June 29, 1869, made a contract with the relator, the Minnesota Railway Construction Co., whereby the latter company agreed to build and equip the railway from St. Paul to Winona, and, among other considerations therefor, the former company agreed to and did sell, transfer and assign to the latter all gifts, donations, bounties or aid, in any form or shape, which then had been or might thereafter be given to it, by any person, corporation, municipality or state, to aid in the construction of such railway, including the bonds which the town of Lake City had thus obligated itself to issue and deliver, and all claim, right or demand of the railway com-pany to or for such bonds, against such town. The relator still owns the claim and demand so transferred to it.

The St. Paul & Chicago Railway Co., acting through the relator, proceeded with the construction of the railway, and had the same completed, with the cars running thereon, for the entire distance from St. Paul to Winona, and had in all respects complied with the terms of the ordinance, and had become entitled to the delivery of the bonds, by January 1, 1872.

On February 26, 1872, the legislature, with the consent and

by the procurement of the inhabitants of the town of Lake
City, passed an act entitled "An act to incorporate the city
of Lake City," (Sp. Laws 1872, c. 15,) providing that all the
district of country in the county of Wabasha, and state of
Minnesota, contained within certain described limits "shall
be a city by the name of Lake City, and the people now
inhabiting, and those who shall hereafter inhabit, within the
district of country herein described, shall be a municipal cor-
poration by the name of Lake City," and conferring the usual
powers of municipal corporations.   All of the territory com-
prised in the city thus created (except such as includes part
of the waters of Lake Pepin,) is included in township 111, and
formed a part of the town of Lake City at the time of the pas-
sage and ratification of the ordinance before mentioned.
Immediately upon the passage of the act, the new city was
organized, and has ever since existed, with such territory and
organization; and ever since the organization of the city, the
town organization has been confined to what remained of its
original territory after the city was thus carved out of it.

The act incorporating the city makes no provision whatever
for the payment of any part of the debts or the assumption of
any part of the obligations of the town of Lake City by the new
city of Lake City, but is entirely silent on that subject, nor is
there any general statute of the state, adjusting the debts or
liabilities of the old town with the new city.

By an act of the legislature, approved March 6, 1873, (Sp.
Laws 1873, c. 97,) it is provided "that the name of the town-
ship of Lake City, in the county of Wabasha, be and the same
is hereby changed to the township of Lake," which name it
still retains.

By the official assessment for the year 1876, the total valu-
ation of taxable property in the city of Lake City is $1,072,-
363, and in the town of Lake, $232,695.

The relator having, on its own behalf and that of the rail-
way company, made a fruitless demand on the town and city,
this proceeding was instituted to compel them to issue their

joint and several bonds to the relator, of the character and to the amount provided in the ordinance.

On the return-day of the alternative writ, motions were made by the respondents that the writ be quashed; and these being overruled, and the respondents having answered, the relator moved to strike out portions of the answer; and a motion was also made by respondents for a jury trial. The grounds of each of these motions are stated in the opinion.

*Bigelow, Flandrau & Clark;* for relator.

*Thomas Wilson,* for respondent, the city of Lake City.

*H. D. Stocker* and *W. J. Hahn,* for respondent, the town of Lake.

CORNELL, J.* On the return-day of the alternative writ at the October term, 1877, both respondents made a motion to quash the writ as improvidently granted, on the grounds: (1) That the provisions of the act of March 6, 1868, entitled "An act to authorize the village of Lake City to aid in the construction of the St. Paul & Chicago railway," (Sp. Laws 1868, *c.* 15,) were, as respects the town of Lake, then known by the corporate name of the town of Lake City, wholly nugatory, because the subject of that act, as indicated in its title, related to the "village," instead of the "town," of Lake City, and that the amendatory act of February 2, 1869, (Sp. Laws 1869, *c.* 41,) did not cure this defect. (2) Conceding the validity of such act as amended, and its application to the town of Lake City, the authority it conferred to create and issue bonds for the purpose named, expired on the first day of August, 1870, and as none had been formally executed and delivered under the act prior to that date, it is now too late to regain it; and (3) That the agreement entered into by the town, as evidenced by the ordinance, and set up in the writ, was without consideration and void. In addition to these grounds of objection common to both respondents, the city of Lake City made the further one that the writ would not lie as against it, because, being a new and distinct municipal

*Gilfillan, C. J., having been of counsel, did not sit in this case.

corporation, since created and erected out of a portion of the
territory of the original town of Lake City, and other terri-
tory, it was not liable for any of the debts or obligations of
the old town.

Having no doubt as to the insufficiency of any of these ob-
jections save the last, they were overruled in the decision
then made; but feeling unwilling to finally dispose of the
question presented by the last objection, without a more care-
ful examination than the court was able to give it at that
time, it was deemed best, under the then existing circum-
stances, and in view of the importance of the question, to
deny the motion on this point, *pro forma*, reserving its final
adjudication for further consideration.    Since then, various
motions have been made and are now pending before us,
involving the power of this court to award a jury trial in pro-
ceedings of this character, and, also, questions as to the suf-
ficiency of portions of the respective answers which have
been filed by the respondents.    Having given full considera-
tion to all the questions thus presented, including the one
which was reserved as above stated, the court will now pro-
ceed to make final disposition of the same, and, also, to give
the reasons which controlled its decision in overruling the
objections first raised and determined.

The line of railway in aid of which the special law of March
6, 1868, was passed, was formerly known as the St. Paul &
Winona branch of the St. Paul & Pacific road, and when this
law was passed, the line of road was already located from St.
Paul to Winona, through Wabasha county, under the act of
March 2, 1865, (Sp. Laws 1865, *c.* 6,) which was declared to
be a public act, by the provisions of which the road was
required in terms to be built "by the way of and through the
following cities and villages, to wit:   Hastings, Red Wing,
Lake City, Wabasha and Minneiska."    The political and
municipal subdivisions of the state are matters within the
judicial cognizance of the courts.    In construing these stat-
utes, then, this court must recognize the facts, that at the

time of their enactment, there was no incorporated city or village bearing the name of Lake City, within the limits of Wabasha county, although there existed, in fact, a town organization, under the corporate name of the town of Lake City, embracing in its limits government township number 111, north, of range 12, west, in said county, in which was a settlement of the size and character usually denominated a village, and through which the railroad in question was in fact actually located. It is obvious from these facts, that the "Lake City" mentioned in the act of 1865, as one of the *villages* through which the road was required to be built, is the same municipal organization referred to in the first section of the act of March 6, 1868, as the town of Lake City, and in other parts of said last-named act, as well as in the title thereof, as the said village of Lake City. That the use of the word "village," instead of its corporate legal name, to designate the municipality intended, was clearly a legislative inadvertence, is made manifest by the amendatory act of 1869, which substituted the word "town" for "village," wherever the latter occurred in the original act.

The objection that the subject of the enactment was not sufficiently indicated by the title to comply with the constitutional requirement in this regard, because the word "village," instead of "town," was erroneously used therein, is without merit. In view of the foregoing recited facts of public notoriety, it can hardly be pretended that any one, either within or without the legislature, was deceived or misled in regard to the purposes of the legislation, as thus indicated by that title; and it affirmatively appears that the municipal corporation of the town of Lake City, and the electors thereof, acted under the provisions of the law, without question that it was intended for them.

The questions raised by the second and third grounds of objection above stated have both heretofore been fully considered and determined by this court, the latter, in the case of the *State* v. *Town of Lime*, 23 Minn. 521, 526, and the former

in *Warsop* v. *City of Hastings*, 22 Minn. 437.   In the last-
named case, the question presented arose upon a statute
identical in substance with the one now under consideration.
No good reason is perceived for overruling the doctrine of those
cases.

Having thus stated the grounds upon which the objections
taken to the writ on the motion to quash were then overruled,
it remains next to consider the question, which was then
reserved for further examination, and which was raised solely
by the respondent, the city of Lake City.   The point made is
that no liability exists against the city under the act of March
6, 1868, because its corporate existence is derived from sub-
sequent legislation, which contained no provision making it
liable for any of the debts or obligations of the town of Lake
City, a portion of whose territory was included in the new cor-
poration.

Considered as a question of power solely, the absolute right
of the legislature, in all cases not within any constitutional
prohibition or restriction, to create, alter, divide and abolish
township organizations, or municipalities having *quasi* cor-
porate powers and functions, and to make such division and
apportionment of the property and debts of the old corpora-
tion, in case of a division of its territory, between it and the
new organization created in whole or in part out of a portion
of such territory, as may suit legislative policy or discretion,
and without any regard to the wishes or interests of the in-
habitants affected thereby, has been so often asserted and so
uniformly maintained by the courts, both federal and state,
as to have become the settled and unquestioned law in this
country.   This right of absolute control rests upon the politi-
cal nature of municipal corporations, which are created solely
for public purposes, as a part of the governmental machinery
of the state, and are, of course, subject to the mere will and
pleasure of the sovereign power.   It is, in its nature, purely a
legislative power, and whether exercised wisely and prudently,
or otherwise, in any particular case, its wisdom or propriety

cannot be challenged or brought in question by the judiciary. As a necessary incident to the exercise of this power, "the legislature, in dividing towns, (says the court in *Laramie County* v. *Albany County*, 92 U. S. 307,) may settle the terms and conditions on which the division shall be made. It may enlarge or diminish their territorial limits, may extend or abridge their privileges, and may impose new liabilities," and however seemingly unjust or grievous the result to the old town and its inhabitants, or to the new, the injury is one of which courts can take no cognizance, and for which they can afford no relief. It is also equally well settled, that whenever, in dividing a town, no provision is made in respect to its indebtedness or obligations, the old town remains solely responsible therefor, without any right to claim contribution from the new corporation. The rule is stated by Chief Justice Parsons, in delivering the opinion of the court in *Windham* v. *Portland*, 4 Mass. 389, thus: "If a part of its territory and inhabitants are separated from it by annexation to another, or by the erection of a new corporation, the former corporation still retains all the property, powers, rights and privileges, and remains subject to all its obligations and duties, unless some new provision should be made by the act authorizing the separation." This is, undoubtedly, a correct statement of the rule, with the qualification, as respects the public property of the old town, that the latter retains only that portion of it situate and being within the reduced limits, while the new organization acquires title to that located within its boundaries. In *Laramie County* v. *Albany County*, *supra*, the court, per *Clifford*, J., cite this doctrine as the undoubted law, and say: "Regulation upon the subject" of an apportionment and division of the debts and liabilities "may be prescribed by the legislature; but if they omit to make any provision in that regard, the presumption must be that they did not consider that any legislation in the particular case was necessary. Where the legislature does not prescribe any such regulations, the rule is that the old corporation

owns all the public property within her new limits, and is-responsible for all debts contracted by her before the act of separation was passed. Old debts she must pay, without any claim for contribution; and the new subdivision has no claim to any portion of the public property, except what falls within her boundaries; and to all that the old corporation has no claim." The authorities in support of these propositions are very fully cited in this case of *Laramie County* v. *Albany County*, 92 U. S. 307. See also *State* v. *McFadden*, 23 Minn. 40.

The writ herein, as well as the information upon which it was issued, recites that the obligations sought be enforced were contracted originally by the town of Lake, under its then corporate name of the town of Lake City. That afterwards, by an act of the legislature of February 26, 1872, the city of Lake City was created and organized into an independent municipal government, with boundaries embracing a large part of the town of Lake, and also a portion of an adjoining township; that that portion of the town so set off and included within the limits of the new city comprised most of the inhabitants, and the most valuable part of the property in the town, the taxable value of the part remaining being $232,695, while that set off amounted to $1,072,363, according to the assessment rolls of 1876. It is also stated that the act of incorporation and division makes no provision whatever for the payment of any part of the debts, or for the assumption of any portion of the liabilities of the old town by the new city, it being wholly silent upon that subject; and that there is no statute law of the state regulating or providing for the adjustment of such matters, in such a case. It is conceded by relator that, upon this state of facts, the city is not liable at law for any portion of the debts of the old town; but it is insisted that it can be made to respond for its proportionate share thereof, in equity. Upon what ground this equity can be based, it is difficult to see. Without an obligation or duty of some kind requiring the new corporation to contribute

toward the fulfilment of the contract of the town, there certainly can be no liability in respect thereto against it, either legal or equitable. By its charter, no duty or obligation of any kind was imposed in reference to the liabilities of the town; and as that is the source of all its duties in this regard, the equitable claim would seem to have no support. The fact that a large portion of the taxable property and of the population in the town was transferred to the city, and the further fact that the latter profited most from the improvements for which the obligations were incurred, constituted good reasons why the legislature ought, perhaps, to have made some provision for an equitable apportionment of its burdens; but they furnish no ground for any equitable relief by the courts, either in favor of the town or its creditors. *Wade* v. *Richmond,* 18 Grattan, 583; *Laramie County* v. *Albany County,* 92 U. S. 307.

The alleged liability against the city respondent is also sought to be predicated upon the propositions that the obligation for the issue and delivery of the bonds, and for their payment, which was contracted by the town, under the authority of the enabling act of 1868, bound the town for its fulfilment, with its then established limits, including all the taxable property therein; and that any municipal corporation subsequently created, in whole or in part, out of any portion of its territory, thereby became the successor of the town in respect to such portion of territory and the taxable property therein, and, to that extent, responsible for the liability incurred by the town; and that the binding force of this obligation is unaffected by the subsequent act incorporating the city, because of the protection afforded to all contract rights by the federal and the state constitutions. The correctness of this position depends upon the construction of the special law under which the obligation was incurred. By its provisions, the town was authorized in terms, "by a vote of a majority of its supervisors, or their successors in official trust, subject, etc., * * to create and issue its bonds" in the amount, and for the purposes therein named, "and to pledge

the faith of said town, or the municipal corporation which
may succeed it, for the payment of the principal and interest
of said bonds." The second section provides for the sub-
mission to the voters of the town of the question whether the
bonds shall be issued in aid of the contemplated enterprise,
and for that purpose, "the said supervisors or their successors
in official trust," are authorized to call the requisite election.
If the proposition so submitted is approved at such election,
then "the said supervisors or their successors in official trust
may make any and all such agreements as they may deem
proper with said railway company for or relating to the dis-
posal of the said bonds, or the proceeds thereof, in aid of
said railway." Section 3 directs that "for the purpose of
paying the principal and interest of said bonds, an annual
tax shall be assessed and levied upon the taxable property of
said town, sufficient to pay the interest, * * and when
the principal * * * is about to become due, a sufficient
amount to pay such principal," and "the said supervisors"
are authorized to apportion the payment of principal and
interest upon such years as they may deem expedient, "or
they may annually levy upon such taxable property, and
cause to be set apart as a sinking-fund, such sums as, with
the accrued interest thereon, shall amount to an equal pro-
portion of the whole amount of bonds issued, which shall be
applied to the punctual payment of said bonds at maturity."
It also declares that "said taxes shall be levied and collected
in the same manner as other taxes are levied and collected
in said town, or the municipal corporation which shall suc-
ceed it."

These are all the provisions having any bearing upon the
questions under consideration. From them it is obvious that
the power to create and issue bonds, and make contracts in
relation thereto with the railway company, was conferred
solely upon the municipality then existing and recognized as
a distinct legal entity, known by the corporate name of the
town of Lake City. The bonds which were to be given were

*its* bonds. Their payment was to be provided for by a pledge of *its* faith, or that of "the municipal corporation which might succeed it," and by an annual tax, to be imposed by it or such its successor, upon the taxable property in said town, sufficient to meet the obligations at maturity, or to create a sinking fund for that purpose. These are the only securities which were authorized to be pledged or given. They do not cover the right of taxation upon any property or persons outside the jurisdictional limits of the town or its legal successor at the time the tax may be assessed and levied, nor do they create any specific lien on any property in favor of the bonds. The act contains no provision against the reduction of the taxable area of the town by the annexation of a portion of its territory to another town, or by its erection into another municipality, according as public exigency or convenience may, in the judgment of the legislature, require; nor is it provided, in case this undoubted legislative power is exercised, that the subjects of taxation that may thereby be withdrawn from the jurisdiction of the town shall remain liable to contribute proportionally to the payment of any tax that may be imposed for the purpose of paying the bonds. In the absence of any such provisions, there is no doubt that it was competent for the legislature, if, in its judgment, some public convenience or necessity demanded it, to erect a new municipal corporation out of portions of the town, and to that extent lessen the security of its creditors, without the violation of any of their contract rights. *Wade* v. *Richmond*, 18 Gratt. 583. The bonds in this case were authorized to be issued subject to the exercise of this power in the legislature, and hence no contract obligation has been impaired. The authority to tax all the subjects of taxation within the town, to the extent provided for in the act, still remains undisturbed.

Whether, in case of an indebtedness contracted by a municipal body upon the faith and credit of a sufficient sinking-fund authorized to be created by taxation to meet it, it is within the constitutional power of the legislature to reduce

the territorial limits of the corporation to such an extent as to render its taxing power to that end wholly inefficient and nugatory, need not to be considered at this time, because, upon the facts stated in the information and writ, the case before us presents no such question. The inability of the reduced town to sustain the taxation necessary to provide the requisite sinking-fund contemplated by the act is not alleged, and, for aught that appears, it may be fast increasing in wealth and population, and abundantly able to meet its obligations at maturity. Such, at least, must be the presumption; for, in the absence of an express showing to the contrary, it cannot be supposed that, in incorporating the city, the legislature intended to destroy or materially weaken the ability of the town to meet its liabilities, or that it acted upon any other than legitimate public considerations.

The words "their successors in official trust," as used in this statute of March 6, 1868, mean "the successors in office" of the supervisors, including perhaps those who may succeed them in their official duties, though under some different name. The phrase has no other significance. In no just sense can the city of Lake City be said to be a municipal corporation which has succeeded the town, for the latter still exists as a distinct corporation, in the enjoyment of all its municipal powers and franchises, though shorn of a portion of its territory.

For these reasons, this court is constrained to hold that the relator has no claim whatever against the respondent city, either of a legal or equitable character, and the writ as to it must be quashed as having been improvidently granted.

In view of this conclusion, it is only necessary to consider the remaining questions so far as they affect the town of Lake. After admitting the passage of the ordinance set forth in the writ as therein alleged, the return of the town proceeds as follows: "It (the town) alleges that before said ordinance was so passed by said supervisors as aforesaid, the said St. Paul & Chicago Railway Company, fraudulently and cor-

ruptly, and for the purpose of inducing the then supervisors of said town to pass the same, promised and agreed to and with the said supervisors, that if they would pass the said ordinance as aforesaid, that it, the said St. Paul & Chicago Railway Company, would locate the depot of said company in said town of Lake City, on the private property of said supervisors; and represented to said supervisors that by reason of such location, the said property of said supervisors would be greatly enhanced in value; that said supervisors, induced and influenced by said fraudulent and corrupt promise and agreement, and by other and further fraudulent and corrupt considerations then paid and promised to said supervisors by said company, passed the said ordinance; and said respondent, on its information and belief, alleges that the said supervisors would not have passed the same, but for the said fraudulent and corrupt promises and payment aforesaid." "And respondent further alleges that said St. Paul & Chicago Railway Company, before the passage of said ordinance, and as an additional and further inducement to pass the same, and also to induce and influence the voters of said town to ratify said ordinance, falsely and fraudulently represented that said company would build its engine-houses, car and machine-shops in said town of Lake City, and thereby increase the property of said town liable to taxation, and its population, to a great extent, which representations and promises were false and untrue, and only made for the purpose aforesaid."

The motion of the relator is to strike out these portions of the return as irrelevant and redundant. There can be no doubt that the motion should be granted as to the last paragraph above quoted. It is not stated to whom the said alleged representations were made, whether to the supervisors, the voters, or in a general public way, without being specifically addressed to any one. Nor is it claimed that any one was influenced by them, or acted on them. They related to no existing facts or condition of things, but were simply promissory in their character. No voter was justified in

placing any reliance upon their fulfilment, for the ordinance alone contained the terms and conditions of the contract between the town and the company, which he was called upon to approve or reject. The effect likely to be produced by building the engine-houses and car and machine-shops of the company in the town, upon the value of property and increase of population, was a matter as fully within the knowledge and means of information of the citizens of the town as of the company, and it is not even averred that these buildings. were not erected with the results predicted. Clearly, the matter is immaterial and irrelevant in any view, and must be stricken out.

The question of striking out the other portions of the answer objected to, is, perhaps, not so free from doubt. The matter thus objected to is set up in attempted avoidance of the relator's claim, by impugning the validity of the ordinance upon which it rests. It does not seek to impeach the ordinance for any want of authority, or irregularity, in its passage, or for any inherent vice or illegality in any of its provisions, but because its passage was effected by means of a. corrupt collateral agreement between the railway company and the officers of the town who voted for it, whereby the action of the latter in the premises was improperly influenced.

Conceding such a defence to be good as against the railway company, it is insisted that it cannot avail as against the relator, because, acting in good faith upon the validity of the ordinance, with no notice or knowledge of any vice or fact injuriously affecting it, it took an assignment of the claim against the town for the bonds, for a valuable consideration, and thereupon went on and completed the road for the benefit of the town, in accordance with the provisions of the ordinance, with no protest or objection, but with the silent acquiescence of the latter. It may be that the town, under such circumstances, would be estopped from interposing the alleged defence against the construction company, if, knowing

these facts, or legally chargeable with notice thereof, it after-
wards permitted the relator to go on and build the road,
without taking any steps to rescind its agreement under the
ordinance, or to notify the relator of its intention so to do,
and without showing any legal excuse for its omission in
that regard. But upon the allegations of the information
and writ, and the return, it cannot be said that the relations
existing between the town and the relator are of this char-
acter. It does not appear that the construction company
was induced to enter into its contract with the railway com-
pany, or that it did anything thereunder, by reason of any
belief or reliance placed upon the validity of the ordinance
in question. It is only averred "that it became the owner
of the claim and right against the town for the bonds, under
an agreement between it and the railway company, by the
terms of which the latter, in part consideration for building
and equipping its said road, agreed to and did, by said con-
tract, sell, transfer and assign to relator all gifts, donations,
bounties, or aid which then had been, or might thereafter be
made or given to it, including the bonds in question, and all
claim, right or demand of the said railway company, to or
for said bonds, against said town." It cannot be assumed
from this that the relator built the road or did anything by
reason of any reliance placed upon the validity of the ordi-
nance, or of the company's claim against the town. Its
undertaking was based solely, so far as appears, upon the
agreement of the railway company, containing, among other
considerations and stipulations, (not particularly named,)
the assignment of its claim against the town. These other
considerations and stipulations referred to may have been the
controlling cause of its action and the agreement on its part.
It does not appear that the town ever had any notice of this
agreement, or that it ever knew that the construction com-
pany was building the road, or that it had become the owner
of the claims in question. On the contrary, it is expressly
stated by the relator, in its information and the writ founded

thereon, that the road was built and completed by the Saint Paul & Chicago Railway Company, acting by and through the construction company, and that all the conditions of the ordinance in respect to such construction were fulfilled and performed by the railway company, acting as aforesaid.

Upon these facts the respondent is not precluded from interposing any defence it may have to the issuance of the bonds, by any principle of estoppel, for it has neither done nor refrained from doing, under circumstances requiring action, anything whereby the relator has been in the least prejudiced. The position of the relator, then, being at best only that of an innocent assignee for value, it holds the claim subject to all defences, legal or equitable, which existed against it in the hands of the assignor at the time of the assignment. This raises the question whether the alleged corrupt transactions and agreement between the railway company and the town supervisors, whereby, in consideration of the passage of the ordinance by the latter, the company promised and undertook to locate its depot in said town, upon their private property for their individual benefit, and which alone induced the passage of the ordinance, so affected the rights of the company under it that its obligations are incapable of enforcement against the town in favor of the railway company. It is undoubtedly true, as contended by the relator, that the motives by which legislators are individually governed and influenced in the enactment of laws cannot properly be made the subject of judicial inquiry, for the purpose of defeating their operation, or any rights attempted to be asserted under them, (Dillon Mun. Corp. § 248, and authorities there cited,) and it may be conceded that a like rule prevails in considering the ordinances of municipal bodies, when they are of a strictly legislative character, as would be the case with ordinances relating solely to the good order and government of the municipality, and prescribing permanent or general rules and regulations in respect thereto. Dillon Mun. Corp. note to § 244.

The ordinance in question, however, is not one of this character. It prescribes no rule or regulation of conduct or government, in the nature of a municipal law or ordinance in its strict and appropriate sense; and its provisions pertain to no matter or subject coming within the scope of the general legislative authority conferred upon the town. It is rather in the nature of a contract between the town and the railway company, entered into and executed on the part of the former, under and by virtue of a special statutory authority, a substantial compliance with which is necessary to give it validity. It may well be doubted whether the rule in question has any application to such a case, though the decision of the question is not deemed necessary upon the facts of this case. The real question before us is whether, upon the facts stated, the authority conferred by the statute in this instance has been exercised in such substantial compliance with its provisions, and under such circumstances, that the obligations of the contract evidenced by the ordinance can be enforced against the town, as between it and the company? The statute provides in terms that the town "may, by a vote of a majority of its supervisors, subject to the approval and ratification of its legal voters," as therein provided, "create and issue its bonds," to the amount named, and for the purpose indicated, and "pledge its faith for their payment." The vote of the supervisors, and the ratification by the voters, are both essential to the creation of any valid obligation against the town; neither is sufficient without the other; an approval by the electors of a proposition submitted to them, without any prior favorable decision by the supervisors, would be a nullity and of no avail.

It was the obvious purpose of these provisions to serve as a check upon any hasty and inconsiderate action, whereby the town might, under the influence of temporary excitement and delusive expectations, be led to assume greater burdens of taxation and indebtedness than its taxable resources would be able to sustain; and in construing these provisions, it is

the clear duty of the courts to give effect, so far as possible, to this legislative intent. The vote of the supervisors which is provided for must, therefore, be regarded as something more than a mere formality, to be observed by them simply in accordance with the letter of the statute, and without any reference to the interests of the town. The delegated authority conferred upon them was in the nature of a public official trust, the proper execution of which involved the performance of a duty to the town, for whose interests, and not their own, they were empowered to act. It required them in the first instance, before submitting to the electors any proposition for aid, to determine favorably the question whether, under the circumstances, the town ought to grant it; and this upon their own independent judgment and discretion, exercised honestly and in good faith for the benefit of the town, upon public considerations, and not for private purposes. A vote given upon other considerations, or as the result of a decision reached in any other way, would not be within the meaning or intention of the statute. Especially, if it was induced by secret bribery and corruption, and rested solely upon considerations personally beneficial to the supervisors alone, as individuals, it would be in gross violation of their official duties under the statute, and in direct contravention of its purposes and policy. It would operate as a fraud upon the town, and a deception upon its electors. Its effect would be to deprive the former of the benefits intended to be secured by the statute by the vote which its supervisors were authorized to give, which implies an honest exercise of judgment on their part, and a decision accordingly. Relying upon the integrity of such decision, the voters, in acting upon the question of ratification, would very likely approve a proposition which they would reject if informed that it had its inception alone in a secret and corrupt bargain between its officers and the company.

If, then, as is substantially alleged in that portion of the answer of the respondent town now under consideration, the enactment of the ordinance in question was procured from the

supervisors by the railroad company by corrupt means and influences, such as a secret understanding and agreement between them by which its depot and other buildings were to be erected upon their private property, upon the promise or representation, and in the expectation, that the same would be thereby largely enhanced in value, and this was the sole consideration and inducement for their vote, without which it would not have been given, its obligations cannot be enforced against the town at the suit of such company. The act of procuring the ordinance by such means was one of gross moral turpitude. The frequent acts of legislation giving to municipal bodies, conditionally and otherwise, the right to aid private corporations in the prosecution of public enterprises, make it a matter of public concern that such public officers as may be entrusted by the legislature with any duty and authority in respect thereto shall not be corruptly influenced in the discharge of their official duties by any party thus seeking municipal aid; and whenever, in the performance of any such duty, an act is done through the corrupt procurement of another, in plain violation of the officer's duty, though apparently within the scope of his authority, public policy and the interest of morality forbid that the guilty procurer of such wrongful act shall reap any benefits therefrom, through the aid of the courts in enforcing the execution of a contract originating in the vicious transaction. For these reasons, the motion to strike out this portion of the answer should be denied.

The claim of respondent in respect to its right to a trial of the issues of fact herein by a jury raises the same question which was presented and decided in *Atherton* v. *Sherwood*, 15 Minn. 221, and which was subsequently recognized as settled in *Commissioners of Mille Lacs County* v. *Morrison*, 22 Minn. 178. The provision in article 1, section 4, of our constitution, that "the right of trial by jury shall remain inviolate, and shall extend to all cases at law," must be construed in connection with section 2, article 6, of the same instrument, which confers

upon this court "original jurisdiction in such remedial cases as may be prescribed by law," coupled with the express prohibition, "that there shall be no trial by jury in said court." This negatives any implication that the right to a jury trial can be enjoyed in the trial and determination of such remedial cases as this court may be authorized to try, in the exercise of its jurisdiction under this latter section. A distinction is clearly made between the class of cases denominated, "cases at law," in the former section, and that included under the designation of "remedial cases," in the latter section. The former evidently refer to ordinary common-law actions, while the latter embrace those remedies of a special or extraordinary character, usually spoken of as special proceedings, in contradistinction from ordinary common-law actions, such as mandamus, *quo warranto* and other proceedings of a like special or extraordinary character; as to these latter, we have no doubt it was not the intention of the framers of our constitution to apply the provisions of section 4, article 1. This conclusion is strengthened rather than weakened by the fact adverted to by respondents' counsel, that at the time of the adoption of the constitution, the right to a jury trial was provided for in a proceeding by mandamus in this court, for it shows that the framers of that instrument must have had this practice in view when they expressly provided for the continuance of such original jurisdiction, but at the same time coupled with it an express prohibition against allowing a jury trial. The motion for a jury trial must, therefore, be denied, and a referee appointed to take testimony.

Let an order be entered in conformity with the views hereinbefore expressed, quashing the writ as to the respondent, the city of Lake City, striking out and amending the answer of the other respondent so as to conform the same to this opinion, and referring the case to Hon. A. J. Edgerton, of Kasson, as sole referee, to take and report the testimony herein, or to such other person as may be agreed upon by the parties as such referee.